**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) No. 3:12-00215
) Chief Judge Haynes
)
KENDRICK HUTTON, )
)
Defendant. )

**MEMORANDUM**

The United States filed this action against the Defendant Kendrick Hutton charging him as a felon in possession of a firearm.

Before the Court is Defendant's motion to suppress (Docket No. 25), to which the Government responded (Docket Entry No. 28). Defendant contends that the initial traffic stop was illegal and the physical evidence and statements obtained in the course of his arrest and detention should be suppressed as a violation of his Fourth, Fifth, and Fourteenth Amendment rights. In response, the Government contends that the police officers had reasonable suspicion and/or probable cause to stop Defendant and the resulting seizure of the firearm was lawful. The Court held a hearing on Defendant's motion to suppress on April 4, 2013, and Defendant filed a post-suppression hearing brief. (Docket Entry No. 38).

Also, before the Court is Defendant's motion to reconsider Order of detention (Docket Entry No. 39), contending that the Magistrate Judge erred by not releasing him on conditions at the November 28, 2012 detention hearing and that new evidence, that was not known at the time of the

detention hearing, supports Defendant's release on conditions. In response, the Government contends that because of Defendant's dangerousness to the community there are not any conditions that could be imposed that would reasonably assure the safety of other persons in the community. (Docket Entry No. 43).

**A. Review of the Record**

On November 15, 2012, Detectives Jeff Moseley and Dan Bowling, law enforcement officers with the Special Investigation Divisions of the Metro Nashville Police Department known as the Gang Unit, were traveling in a Nissan Titan pick-up truck westbound on Herman Street in North Nashville. (Docket Entry No. 37, Suppression Hearing Transcript at 8, 10, 42-43). At approximately 9:30 p.m., the detectives observed a Chevrolet TrailBlazer SUV with its front two doors open stopped at the stop sign at the intersection of Herman Street and 19th Avenue. Id. at 11, 17, 34, 35-36, 44, 48. The detectives saw the driver and Hutton, who was sitting in the passenger seat, exit the SUV, walk behind SUV and then reenter the vehicle, switching places in the vehicle in the process. Id. at 17-18, 34, 44-45. The occupants were neither wearing any gang paraphernalia nor did they appear intoxicated or behaving erratically. Id. at 22, 45. According to Moseley, he saw the SUV when the detectives were under the overpass on Herman Street and it took about ten to fifteen seconds to reach the SUV. Id. at 18, 34. Bowling testified that he saw the SUV before the detectives reached the overpass and it took approximately five to ten seconds to reach the SUV. Id. at 48-49.

As the detectives approached and stopped behind the parked SUV, the occupants were getting back into the SUV and closing its doors. Id. at 11, 50. According to the detectives, the occupants sat for either fifteen or twenty seconds in the SUV before Hutton put the vehicle in drive and turned left onto 19th Avenue. Id. at 18, 35, 45. As the SUV started to proceed through the intersection,

Detective Bowling activated his vehicle's blue lights and siren, and the SUV immediately pulled into a driveway on 19th Avenue. Id. at 36, 45, 53. Bowling testified that in the normal course of traffic, when a car pulls up behind a car stopped at a stop sign, the second car may wait ten to fifteen seconds to proceed through the intersection. Id. at 46, 51.

As grounds for stopping Defendant, Moseley testified, "Shortly before we stopped them, I mean, we noticed that they were stopped in traffic, they were impeding our traffic, and they were blocking the roadway. So we made a decision we were going to make a stop on them." Id. at 19. Mosely explained that the reason the Defendant was not stopped while the SUV was parked at the stop sign was that it was "a bad place to make a traffic stop. There was a retainer wall on the right side. If cars were stopped behind us, trying to make their way through the intersection, it would be a dangerous -- dangerous place to make a stop," as such cars "would be in the oncoming lane." Id. at 19, 21. Mosely stated that there is not a stop sign on 19th Avenue and the retaining wall obstructs the visibility of vehicles traveling south on 19th Avenue that are turning left onto Herman Street. Id. at 20-21. No cars drove by from the time the detectives' first saw the SUV and until they pulled the SUV over on 19th Avenue. Id. at 21, 39.

Bowling testified that he stopped the SUV for parking within 30 feet of a stop sign and for obstructing a passageway. Id. at 55, 58. Bowling testified that he was familiar with the infraction of parking within 30 feet of a stop sign, but admitted that he was unfamiliar with any exception to that rule. Id. at 56. In his state affidavit of complaint, Bowling stated that the SUV was "stopped for being in the middle of a street while several occupants exited the vehicle." Id. at 57. Bowling did not state in his affidavit that he stopped the vehicle for being within 30 feet of a stop sign. Id. Bowling did not issue a citation for parking within 30 feet of a stop sign or for obstructing a

passageway. Id. at 59. At Defendant's detention hearing, ATF Agent John Harrell, who spoke to Bowling and reviewed Bowling's investigative report, testified that the traffic stop was for a violation for "impeding traffic." (Docket Entry No. 30-1, Transcript of Detention Hearing at 4-6, 14, 16-17).

According to Bowling's investigative report, Bowling approached the driver side of the vehicle and detected an odor of marijuana. (Docket Entry No. 25-1). Bowling asked Defendant to climb out of the vehicle, whereupon Defendant attempted to flee. Id. Bowling apprehended Defendant, and a search of Defendant's person uncovered a handgun and a plastic bag with marijuana. Id.

The Chevrolet TrailBlazer SUV driven by Defendant measured 111 inches wide with the driver-side door open. (Docket Entry No. 37 at 70). Defendant presented demonstrative evidence depicting Federal Public Defender Brian Carter's 2007 Dodge Magnum parked at the corner of Herman Street and 19th Avenue near the stop sign where Carter believed the SUV was parked on the night of the traffic stop. Id. at 65, 68; Defendant's Exhibit Nos. 3-6. Carter measured his vehicle with the driver's door open and determined that the width to be 112 inches. Id. at 74. From curb to curb, the roadway on Herman Street is 36 feet wide. Id. at 77. While at the corner of Herman Street and 19th Avenue, Carter observed several vehicles safely going around his car parked near that intersection. Id. at 78.

Carter also parked a Chevy Tahoe at the corner of Herman Street and 19th Avenue where the vehicle was purportedly parked on the night in question. Id. at 72-73. The Tahoe measured 117 inches wide with the driver's side door open. Id. at 80. Carter measured from the open driver's side door of the Tahoe to the other side of the street on Herman Street and the measurement was 22 feet.

Id. Two videos were played showing the Chevy Tahoe parked at the intersection of Herman Street and 19th Avenue near the stop sign. Id. at 78-79; Defendant's Exhibit Nos. 7-9. Carter testified that the vehicles drove without difficulty around the parked Chevy Tahoe. Id. at 78-83.

Carter also parked a Chevrolet Yukon near the stop sign at Herman Street and 19th Avenue with the doors open at nighttime. Id. at 84. The Yukon measured 119 inches wide with the driver's side door open. Id. at 85. A video shows other vehicles driving around the parked Yukon without difficulty. Id. at 89. The Court notes that the videos and photographs presented by Defendant do not depict a situation where a vehicle is passing the parked vehicle on Herman Street and encounters an oncoming vehicle turning off 19th Avenue.

**B. Conclusions of Law**

The Fourth Amendment protects individuals from unreasonable searches and seizures and evidence that stems from unreasonable searches or seizures must be suppressed. Wong Sun v. United States, 371 U.S. 471, 488 (1963). Traffic stops are seizures within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996). "Stopping and detaining a motorist 'constitute[s] a seizure' within the meaning of the Fourth Amendment even if 'the purpose of the stop is limited and the resulting detention quite brief.'" United States v. Bell, 555 F.3d 535, 539 (6th Cir.2009).

"Under the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry[1] stop which must be predicated upon 'reasonable suspicion;' and

[1] Terry v. Ohio, 392 U.S. 1 (1968).

arrests which must be based on probable cause." United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004) (quoting United States v. Bueno, 21 F.3d 120, 123 (6th Cir. 1994)).

In Gaddis v. Redford Twp., the Sixth Circuit summarized the circuit's traffic stop jurisprudence as follows:

> Police may make an investigative stop of a vehicle when they have reasonable suspicion of an ongoing crime, whether it be a felony or misdemeanor, including drunk driving in jurisdictions where that is a criminal offense. Police may also make a stop when they have reasonable suspicion of a completed felony, though not of a mere completed misdemeanor.
>
> Next, police may make a stop when they have probable cause to believe a civil traffic violation has occurred, even if the defendant raises a claim that the stop was pretextual . . . [.]

364 F.3d 763, 771, n. 6 (6th Cir. 2004) (citations omitted).

In the Sixth Circuit, probable cause is required to justify a traffic stop of a completed misdemeanor traffic violation. United States v. Hughes, 606 F.3d 311, 316 n.8 (6th Cir. 2010); United States v. Simpson, 520 F.3d 531, 541 (6th Cir. 2008) (holding that reasonable suspicion applies to an ongoing violation of any crime, including misdemeanors, while probable cause applies to completed misdemeanors); United States v. Jeffries, 457 Fed. Appx. 471, 477 (6th Cir. 2012); United States v. Guajardo, 388 Fed. Appx. 483, 487 (6th Cir. Aug. 5, 2010); United States v. Torres-Ramos, 536 F.3d 542, 550 (6th Cir. 2008). "The requirements of probable cause are satisfied where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) (citations omitted). When there exists probable cause for the traffic stop, "the officer's subjective intent for executing the stop is irrelevant." Torres-Ramos, 536 F.3d

at 550. Reasonable suspicion requires "something more than an 'inchoate and unparticularized suspicion or 'hunch','" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 27), but less than probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing United States v. Montoya de Hernandez, 473 U.S. 531, 541 (1985)). "'Reasonable suspicion is more than an ill-defined hunch; 'it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity.'" Torres-Ramos, 536 F.3d at 552 (citing United States v. Richardson, 385 F.3d 625, 630 (6th Cir.2004) (quoting United States v. Cortez, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)) (internal quotation marks omitted).

> In order for a stop based on a moving or parking violation to be permissible under the Fourth Amendment, it is not sufficient for a police officer to know the facts that give rise to probable cause or reasonable suspicion; the officer must *also*, at the time of the stop, know or reasonably believe that those facts *actually* give rise to probable cause or reasonable suspicion. In other words, in order for traffic stop to be permissible under the Fourth Amendment, a police officer must know or reasonably believe that the driver of the car is doing something that represents a violation of law. This is not to say that officers must be able to, at the time of a stop, cite chapter and verse-or title and section-of a particular statute or municipal code in order to render the stop permissible. This rule might be better stated as saying that police officers may not look for after-the-fact justifications for stops that would otherwise be impermissible; following a stop, the government should not begin poring through state and local traffic ordinances looking for any that a suspect might have violated.

Hughes, 606 F.3d at 316 (emphasis in original) (citing United States v. Ferguson, 8 F.3d 385, 391 (6th Cir.1993) (en banc)).

The Government contends that the reasonable suspicion standard should be applied to the traffic offense of impeding traffic as the traffic violation was not completed until Defendant moved the vehicle and that the detectives had probable cause to stop Defendant for the SUV being parked within thirty feet of a stop sign and opening the door of a vehicle into traffic, unless and until reasonably safe to do so. The Government cites violations of Tenn. Code Ann. § 55-8-154, Metro

Government of Nashville Davidson County, Tennessee, Code of Ordinances §§ 12.40.040.A.2.d and 12.68.070.A as grounds for the traffic stop. Defendant responds that only the probable cause standard applies to the alleged traffic violations as all of the alleged traffic offenses were completed. In any event, Defendant contends that because there was not a traffic violation the traffic stop cannot be justified under either the reasonable suspicion or probable cause standard.

As a threshold matter, the Court concludes that the probable cause standard should be applied to all of the alleged traffic violations as all of the offenses were completed before the stop. While the Court understands the safety concerns of the detectives, those concerns do not render the traffic offenses ongoing for constitutional purposes. In any event, for the reasons discussed infra, whether the Court employs the reasonable suspicion or probable cause standard makes no difference as the Court concludes that the detectives lacked either reasonable suspicion or probable cause that any traffic offense occurred.

**1. Tennessee Code Ann. §§ 55-8-154(a) and 39-17-307**

Mosely testified that the stop was justified for "impeding traffic" and "blocking the roadway," and Bowling testified that one of the grounds for the traffic stop was "obstructing a passageway." Defendant cites United States v. Hughes, 606 F.3d 311 (6th Cir. 2010) as the most relevant case pertaining to this alleged traffic offense and surrounding facts. In Hughes, an officer observed a vehicle stopped near an intersection blocking one side of the road. Id. at 313. The officer observed the vehicle stopped for approximately two and one half minutes before pulling behind the stopped vehicle. Approximately thirty seconds after the officer pulled behind the vehicle, the vehicle moved. The officer followed the vehicle for about half a mile before stopping it. Id. At no time during this encounter was there any traffic on the road. Id. at 318.

At the Federal suppression hearing, the officer stated that he could have cited the defendant for obstructing traffic in violation of Tenn. Code Ann. § 39-17-307. That statute states, "A person commits an offense who, without legal privilege, intentionally, knowingly or recklessly: (1) Obstructs a highway, street . . . to which the public . . . has access . . . ." Tenn. Code Ann. § 39-17-307(a)(1). "Obstruct" means "to render impassable or to render passage unreasonably inconvenient or potentially injurious to persons or property." Id., 39–17–307(b).

Citing State v. Williams, 185 S.W.3d 311 (Tenn.2006), the Sixth Circuit noted that the Tennessee Supreme Court affirmed the "trial court's conclusion that an officer does *not* have reasonable suspicion to make a stop under this statute where a defendant stops his car in one lane of a two-lane road and is not in fact blocking traffic." Hughes, 606 F.3d at 318 (emphasis in original). The Sixth Circuit stated:

> In that case, a Chattanooga police officer on routine patrol observed the defendant's vehicle "stopped with the engine running, blocking one lane of a two-lane road," where there were no other vehicles present. Observing that the trial court found that the defendant was not "obstructing" a street within the definition of [Tenn. Code Ann. § 39-17-307(b)] , the Tennessee Supreme Court concluded that "[b]ecause the evidence does not preponderate to the contrary, we uphold the trial court's findings of fact. In light of the fact that the defendant was not obstructing traffic, Officer Sims could have had no reasonable suspicion...."

Id.

The Government, however, contends that Defendant's reliance on Hughes is misplaced as Hughes and Williams involved a violation of Tenn. Code Ann. § 39-17-307, whereas here the Government alleges a violation under Tenn. Code Ann. § 55-8-154(a). Tennessee Code Annotated § 55-8-154(a) provides, in relevant part:

**§ 55-8-154. Minimum speed limits**

> (a) No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic, except when reduced speed is necessary for safe operation or in compliance with law.

Id.

In response, Defendant contends that based upon the statute's plain language the statute applies to vehicles moving too slowly–not to vehicles that are momentarily stopped–so as to impede the normal and reasonable movement of traffic. In State v. Hannah, 259 S.W.3d 716, 718 (2008), the Tennessee Supreme Court construed Tenn. Code Ann. § 55-8-154(a) to determine whether the trial court properly held that the driver of a slow-moving vehicle does not impede traffic, unless other traffic is made to come to a stop. Applying the plain language of the statute, the Tennessee Supreme Court held "that the plain language of the statute does not *require* an automobile to stop or cause other automobiles to stop in order for traffic to be 'impeded.'" Id. at 720 (emphasis added). The Tennessee Supreme Court elaborated:

> Clearly, the trial court was correct that a driver can "impede" traffic if he or she causes other automobiles to come to a stop. However, that is not the *only* situation in which a driver can violate the statute. The legislature's use of *the phrase "slow speed"* indicates that the statute's scope *is much more broad.* While the legislature did not delineate all of the situations in which a driver "impedes" traffic, we believe that the statute's plain language is sufficiently clear enough for us to conclude that a stop of traffic is not the only situation in which a driver may violate the statute. Moreover, had the legislature intended for a violation to occur *only when an automobile was completely stopped in the roadway* or caused other automobiles to stop, we presume it would have said so. Accordingly, we agree with the State that the trial court's interpretation that a driver must cause other automobiles to come to a stop and wait for an unreasonable amount of time is too restrictive and would essentially emasculate the import of the statute.
>
> Having concluded that the trial court's interpretation was too restrictive, the more difficult question arises: when does a slow-moving automobile "impede" traffic? While a driver *does not have to be stopped* in the roadway or cause other automobiles to stop, we believe that a slow driver does not violate the statute by merely causing minor inconvenience to other motorists.

Id. at 721-22 (emphasis added).

While the Tennessee Supreme Court states that a violation does not occur "only" when an automobile is completely stopped in the roadway or that a driver does not "have to be" stopped, use of such qualifying language indicates that the statute is also applicable to those situations where the driver is in fact stopped. The Court concludes that based upon the Tennessee Supreme Court's interpretation of the statute, Tenn. Code Ann. § 55-8-154(a) does apply to situations where the driver is stopped.

Yet, that does not end the inquiry as to whether Defendant "impede[d] the normal and reasonable movement of traffic" in violation of § 55-8-154(a). In Hannah, the Tennessee Supreme Court, addressing the question of when does a slow-moving automobile "impede" traffic, held:

> We conclude, therefore, that a driver of a slow-moving automobile impedes traffic when his or her reduced speed interrupts the "normal and reasonable movement of traffic" by blocking or backing up traffic, unless the "reduced speed is necessary for safe operation or in compliance with the law." Furthermore, while not an exhaustive list, we believe that when a trial court reviews whether a slow driver impeded traffic it should consider how slow the driver's automobile was traveling, the posted maximum speed limit, the posted minimum speed limit, if any, the effect on traffic, the duration of the effect on traffic, and the normal and reasonable flow of traffic in that area. Also, the trial court should consider whether other traffic could safely pass the slow-moving automobile in the right lane as provided in Tennessee Code Annotated section 55–8–118 (2004).

Id. at 722-23 (footnotes omitted).

Here, it is undisputed that there was not any traffic during the encounter with Defendant. The Government cannot rely on the argument that the detectives constituted the traffic that was impeded. In Hughes, the Court, relying on Williams, 185 S.W.3d at 319 where the Tennessee Supreme Court found that the officer lacked reasonable suspicion to stop the defendant for violating Tenn. Code Ann. § 39-17-307 under similar circumstances, concluded that the officer could have gotten around

the defendant even if the officer would have violated a traffic ordinance to do so and therefore lacked probable cause to stop the defendant under § 39-17-307. Hughes, 606 F.3d at 318. Further, the detectives testified that they sat behind the SUV for either fifteen or twenty seconds before Hutton put the vehicle in drive. Bowling testified that in the normal course of traffic the second car may wait ten to fifteen seconds to proceed through the intersection, thus, putting Defendant within the range of the normal flow of traffic. Also, the videos revealed that cars had plenty of room to pass a stopped vehicle at the Herman and 19th Avenue intersection without difficulty.

Accordingly, for these reasons, the Court concludes that the detectives lacked reasonable suspicion and probable cause of a traffic violation under either Tenn. Code Ann. § 39-17-307 or Tenn. Code Ann. § 55-8-154(a).

### 2. Nashville Municipal Ordinance 12.40.040[2]

Metro Ordinance § 12.40.040.A.2.d. provides that "no person shall . . . [s]tand or park a vehicle, whether occupied or not, except momentarily to pick up or discharge a passenger or passengers . . . [w]ithin thirty feet upon the approach to any flashing signal, stop sign, yield sign or traffic-control signal located at the side of a roadway . . . ." Here, the actions of the occupants in the SUV, including Defendant, do not constitute a violation of this ordinance. The detectives' testimony shows that the SUV was stopped only momentarily for the passengers to exchange seats, in compliance with the ordinance, before proceeding through the intersection. Thus, the Court concludes that the detectives did not have probable cause that a violation of this ordinance occurred.

---

[2]Defendant contends that the Government's reliance on alleged violations of Metro Ordinance § 12.40.040.A.2.d. and § 12.68.070.A. as grounds for the traffic stop should be rejected as an after-the-fact justification prohibited by Hughes, 606 F.3d at 316. As the factual record does not support a violation of these offenses, the Court need not address Defendant's contention.

**3. Nashville Municipal Ordinance 12.68.070**

Metro Ordinance § 12.68.070.A. provides, "No person shall open the door of a motor vehicle on the side available to moving traffic, unless and until it is reasonably safe to do so, and can be done without interfering with the movement of other traffic, nor shall any person leave a door open on the side of a vehicle available to moving traffic for a period of time longer than necessary to load or unload passengers." As stated previously, there record reflects that the detectives did not observe any traffic during the commission of the alleged traffic offenses. Thus, the occupants, including Defendant, could not have interfered with the movement of other traffic when they exited the SUV. Accordingly, the Court concludes that the detectives did not have probable cause that a violation of this ordinance occurred.

Citing Davis v. United States, ___U.S. ___ 131 S. Ct. 2419 (2011), the Government asserts that should the Court find in favor of Defendant the Court should weigh the costs and the benefits of deterrence in determining whether suppression is the appropriate remedy. In Davis, the question was "whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent" that is later deemed unconstitutional. Id. at 2428. The Supreme Court explained that the purpose of the exclusionary rule was to deter future Fourth Amendment violations. Id. at 2426. The Court noted that "[i]f the police . . . had reasonably relied on a warrant in conducting their search, see United States v. Leon, 468 U.S. 897 (1984), or on an erroneous warrant record in a government database, Herring v. United States, 555 U.S. 135 (2009), the exclusionary rule would not apply." Id. at 2429. Similarly, in Davis the Court concluded that the exclusionary rule did not apply because officers conducted the search of the vehicle in reasonable reliance on binding judicial precedent. Id. at 2429.

Unlike Davis, here the detectives stopped Defendant based upon alleged traffic violations and there is no showing that the detectives had a justification, albeit erroneous, on which they reasonably relied in making the stop, rising to the level of those mentioned in Davis. The issue here is whether the detectives had probable cause to effect the traffic stop that resulted in the discovery of contraband. Under Sixth Circuit precedent, the remedy for such an illegal traffic stop under the Fourth Amendment is suppression. See United States v. Lyons, 687 F.3d 754, 763 (6th Cir. 2012) ("In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity. We primarily enforce these standards through the exclusionary rule, which requires the suppression of any evidence seized during a vehicle search premised on an illegal traffic stop.") (citing United States v. Blair, 524 F.3d 740, 748 (6th Cir.2008) (citing Wong Sun v. United States, 371 U.S. 471, 484 (1963)) (citation omitted).

**C. Motion to Reconsider Order of Detention**

Title 18 U.S.C. § 3145(b) provides that "[i]f a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." Under 18 U.S.C. § 3142(f), a detention hearing may be reopened if: 1) new information exists that was unknown to the movant at the time of the detention hearing; and 2) the new information has a material bearing on whether conditions of release that will reasonably assure the appearance of a defendant at trial and have a material bearing on the safety of any other person and the community. United States v. Watson, 475 F. App'x 598, 600 (6th Cir. 2012). Thus, "the new information must be of a nature that would increase the likelihood that the defendant will appear at trial and would show that the defendant is less likely to pose a danger to the community." Id. "Suppression of all the evidence in the case is information that may form the basis

upon which a detention hearing may be reopened." United States v. Shareef, 907 F. Supp. 1481, 1483 (D. Kan. 1995) (citing United States v. Peralta, 849 F.2d 625 (D.C.Cir. 1988)). A district court has the discretion to reopen a detention hearing on this basis. Watson, 475 F. App'x at 601.

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, courts are to consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)-(4).

Absent the suppression of the evidence, the Court would deny Defendant's motion to reconsider the Order of detention. Yet, given the Court's suppression of the evidence, the Court concludes that Defendant's motion to reconsider the Order of detention should be granted. To be sure, "the weight of the evidence against the person" "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." United States v. Stone, 608 F.3d 939, 948 (6th Cir. 2010) (citing United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985) (noting that the weight of evidence against a defendant "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community"). Yet, the Court also must be mindful of Due Process concerns.

Accordingly, the Court will grant Defendant's motion to reconsider Order of detention, but will stay its Order, giving the Government fourteen (14) days to file a statement as to whether it intends to appeal the Court's rulings and the reasons why Defendant should not be released on conditions given the suppression of evidence.

### D. Conclusion

For the reasons stated herein, Defendant's motion to suppress (Docket Entry No. 25) and motion to reconsider Order of detention (Docket Entry No. 39) should be granted.

An appropriate Order is filed herewith.

Entered on this the 2nd day of August, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court